The **MAYOR AND CITY COUNCIL OF the CITY OF COLUMBUS, MISSISSIPPI and Columbus Utility Commission,** Plaintiffs,

v.

**CLARK–DIETZ AND ASSOCIATES–ENGINEERS, INC. and Basic Construction Company, Defendants.**

**No. EC 79–146–WK–P.**

United States District Court, N.D. Mississippi, E.D.

Nov. 10, 1982.

DeWitt T. Hicks, Jr., Columbus, Miss., for plaintiffs.

A. James Anderson and William H. Stanhope, Atlanta, Ga., Fred M. Bush, Tupelo, Miss., and George Mackey, New York City, for Basic.

David L. Sanders, Columbus, Miss., and Ralph B. Powell, Jr., Philadelphia, Pa., for Clark-Dietz.

## MEMORANDUM OPINION

KEADY, District Judge.

In this diversity action removed from the Chancery Court of Lowndes County, plaintiffs, the Mayor and City Council of the City of Columbus, Mississippi, and the Columbus Utility Commission (City), sue defendants, Clark-Dietz and Associates-Engineers, Inc. (Clark-Dietz) and Basic Construction Company (Basic), for damages resulting from the April 13, 1979, failure of a protective levee surrounding the construction site of the Columbus Waste Water Treatment Plant. Located between the Luxapalila River and McCrary Creek, the plant was 98% complete at the time of the levee break. High waters from adjoining streams flowed through the protective levee, ruptured in two locations, and totally inundated the area, causing extensive damage and delay in ultimate completion of the facility.

The City contends that Clark-Dietz, the architect-engineer, and Basic, the contractor, are jointly and severally liable to it for all resulting loss. The court granted a preliminary injunction directing the defendants to proceed with completion of the work, without prejudice to the rights of the defendants against the City or each other. Clark-Dietz, denying liability, asserts that it properly designed the structure and supervised its construction; and it counterclaims against the City for all additional expenses incurred subsequent to the levee breaks. Basic also denies liability, declaring that it constructed the project in accordance with the plans and specifications prepared by Clark-Dietz; and Basic counterclaims against the City for substantial outlays and cross-claims against Clark-Dietz charging negligent design and negligent supervision of the project.

The issues of liability and damages having been bifurcated, the court held an 18-day evidentiary hearing regarding liability. Three fundamental questions were addressed: (1) the cause of the levee failures and the responsibility therefor; (2) the need of and responsibility for an additional slurry wall installed after the failure in undamaged portions of the levee; and (3) responsibility for a slope paving problem with the McCrary Creek access bridge. All parties are involved in resolution of the first two questions. Since the court granted Basic judgment on the pleadings, after statements of counsel, as to the access bridge dispute, only the City and Clark-Dietz are concerned with that issue.

After consideration of extensive evidence adduced at trial, including oral testimony, depositions, photographs, charts and other documentary material, and study of memoranda submitted by counsel, the court makes findings of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ.P., as follows:

## I. FACTS

### A. INTRODUCTION

In order to comply with Environmental Protection Agency guidelines concerning the discharge of untreated sewage into streams, the City, on August 8, 1972, contracted with Clark-Dietz to perform design and engineering services for the construction of a waste water treatment plant. The presence of pre-existing sewage facilities required placement of the proposed plant at the low-lying juncture of the Luxapalila River and McCrary Creek on an abandoned sand and gravel pit. To protect the plant

from the hazards of periodic flooding, Clark-Dietz designed a levee to encircle the site encompassing about 35 acres. Clark-Dietz retained Roger Lind of Ware-Lind Engineers of Jackson, Mississippi, to provide soil tests and technical assistance in formulating the levee design. Lind's tests showed the natural soils to consist primarily of sand and gravel, relatively permeable material. Lind recommended in his design report that a soil-bentonite slurry wall or trench be poured into and through the center of the earthen levee. This slurry wall was to extend from the crest of the levee downward through natural soils to the Selma Chalk, an impervious subsurface soil stratum of varying depths. The soil-bentonite slurry wall, conceived as an impermeable barrier, would prevent occurrence of water seepage in natural soil under the levee. Clark-Dietz incorporated Lind's recommended slurry wall concept in the original levee design.

When the project was first advertised for bids in the fall of 1974, the bids received substantially exceeded projected costs. To reduce costs, the City requested Clark-Dietz to redesign portions of the project. J.C. Goldman, Clark-Dietz' design engineer, consulted officials of Mitsubishi and Engineered Construction Internation, Inc. (ECI), specialty slurry contractors, about changing the levee design. At ECI's suggestion, he opted for the use of a cement-bentonite slurry wall in lieu of one composed of soil-bentonite. Goldman altered the levee design to install the slurry wall only from ground level to the Selma Chalk stratum with the levee embankment to be fashioned with an impervious clay core. The design was further modified to provide a narrowed levee slope of 2 to 1 ratio rather than 3 to 1 as originally planned. Additionally, the modified plans and specifications shifted soil testing responsibilities from the contractor to the City, which reserved the right to secure necessary tests.

After these design changes were made, the project on September 30, 1975, was again advertised for bids. Basic, in a joint venture with Bullard Construction Company, submitted the lowest bid; on December 10, it entered into a construction contract with the City. The contract, drawn by Clark-Dietz, gave Clark-Dietz general control over the work done on the project, required Clark-Dietz to determine whether Basic's work met specifications, and also conferred upon the firm the power to reject work not conforming to plans and specifications.

Inclement weather delayed the commencement of construction until March 1976, when Basic began preparing the work site. On March 23, representatives of Clark-Dietz, Basic, Ware-Lind, Bullard, and ECI met on the job site to discuss installation of the slurry wall. At this meeting Basic announced that the conduits or pipes to pass under the levee through the slurry wall were not immediately available. The design contemplated that these pipes would be laid prior to the levee and slurry wall construction. Nevertheless, Clark-Dietz's representatives, Larry Alden, project superintendent, and Robert DuChaine, project supervisor, determined that the levee construction could proceed without delay and the levee and slurry wall could later be cut for pipe installation. Because of this decision, Basic was allowed to commence pouring of the slurry wall and building of the embankment. When the pipes were later obtained, Basic made the necessary cuts in the levee and installed pipes pursuant to Clark-Dietz' instructions. Construction proceeded until April 13, 1979, when the levee failed at two points, one north and the other south of the plant, where two pipes had been installed through the levee cuts. After floodwaters receded, the pipe cuts were restored and other damages repaired.

Experts for all parties undertook numerous tests and inspections to determine the cause of the failures and evaluate the integrity of the remaining portions of the levee. Over Basic's objections, the City, on Clark-Dietz' recommendation, decided that it was necessary to install a remedial, or second, slurry wall from the crest of the levee to the top of the original slurry wall in order to strengthen the levee embankment. Although Basic constructed this second slurry

wall, the work was done pursuant to federal court order under full reservation of rights against the City and Clark-Dietz for all expenditures so incurred.

To resolve the disputes as to the cause of the levee rupture, the necessity for building the second slurry wall, as well as the repairs to the McCrary Creek access bridge, we separately evaluate each controversy.

## B. CAUSE OF THE LEVEE FAILURES

The parties agree that the failures in both levees occurred almost simultaneously where pipes encased by concrete seepage collars penetrated the slurry wall. It is also agreed that floodwaters did not overlap the embankment, and each failure occurred near the level of the pipes from water seepage which produced a geotechnical phenomenon known as "piping." Piping occurs when water flows along a seepage path through the soil as water exits from ground surface and soil particles are dislodged and washed away. This process gradually produces erosion at the exit location, which in turn progresses toward the source of water flow, thus steadily increasing the size of the seepage channel. At a sufficiently high water pressure and when the seepage path has increased in size to permit uninterrupted flow of water, the soil above the erosion cavity deteriorates and allows water to surge through a pervious earth barrier. Though the experts agree that "piping" caused the levee to fail, they sharply disagree as to the *source* of the original seepage. Therefore the central issue concerning levee failures is whether water seepage developed because of negligent and defective design by Clark-Dietz; negligent inspection, supervision and soil testing by Clark-Dietz; by negligent construction of Basic; or by a combination thereof.

### 1. *Clark-Dietz' Design.*

The levee's final design consisted of an earth embankment ascending approximately sixteen feet above natural grade with a core of clayey cohesive material keyed into a cement-bentonite slurry wall which ex-tended to the subsurface Selma Chalk. The design called for the slurry wall to be a minimum of 1.5 feet wide; as actually constructed the wall was 2.5 feet wide. In addition, during construction Clark-Dietz, through its resident engineer, Robert DuChaine, consented to Basic's proposal that the entire levee be constructed with clayey cohesive material in order to facilitate construction; and this was done.

Clark-Dietz' 1975 design, as prepared by J.C. Goldman, called for certain pipes to pass through the levee with the slurry wall poured around them. After Goldman left Clark-Dietz' employ in January 1975, however, a seepage collar detail was added to drawing SA–3A, showing use of seepage collars on all pipes penetrating the embankment, yet it left unspecified the precise placement of the collars on the pipes. According to Clark-Dietz' superintendent Alden, the collars were not intended to serve any special purpose until the March 23 meeting. It was at this meeting that Basic's personnel announced that the pipes which were to penetrate the levee were unavailable. The primary purpose of the meeting was to discuss the process for pouring the slurry wall. Of this half-hour session, no more than the final 10 minutes of the discussion related to unavailability of pipe. This discussion encompassed two questions of design that Alden then resolved on behalf of Clark-Dietz. First, he agreed that the slurry wall construction could proceed as scheduled without pipes in place. Second, he determined that seepage collars would be adequate for restoring the cuts in the slurry wall necessitated by the delayed pipe installation. Roger Lind concurred in this view. No one else at the meeting had substantive input, or dissented from Alden's decision. Clark-Dietz neither took minutes of the meeting nor prepared any drawings or specifications for restoration of the slurry wall until the cuts were actually made in the levee embankment and slurry wall approximately 18 months later.

In September 1977, when Basic was installing a 42-inch pipe in the south levee, a dispute arose as to the design of the seep-

age collar. Tucker Foster, Basic's project supervisor, instructed his workmen to prepare a collar form consistent with drawing SA–3A that would extend nine inches in all directions around the pipe. According to Foster, he had been instructed by Clark-Dietz' engineers at the March 23 conference to so construct the collar, and have it then encased with clay to seal the concrete, thus eliminating direct contact between the slurry and the collar itself. Disagreeing, DuChaine stopped the work; he maintained that the collar should be keyed directly into the slurry for a minimum of six inches on all sides. He insisted that the collar should be the size necessary to comply with this instruction. Because of disagreement in the field, DuChaine telephoned Alden, who wholly agreed with DuChaine's position.

DuChaine proceeded to put the design in a September 8, 1977, speed letter. Four days later, Foster responded in writing to Alden stating his understanding of the March 23 decision and, though not an engineer, Foster made objections to the design, as follows:

1. The slurry wall was not designed to carry the excess weight of an oversize collar.

2. The extra weight placed around the pipe presents the danger of fracturing the slurry wall and pulling the pipe down due to resettlement.

3. The concrete poured along the slurry wall would result in a cold joint that would allow fluid communication.

(P–5).

Neither Alden nor DuChaine had prior experience with cement-bentonite slurry to provide them with a basis for evaluating the sufficiency of the concrete collar design. Nevertheless, neither contacted any of the other participants at the March 23 meeting, particularly Roger Lind or the ECI representatives, to verify their understanding, nor made further inquiry concerning the use of concrete collars with a slurry wall made of cement-bentonite. The court finds Alden's failure to make such inquiry to be significant. Roger Lind, at trial, was unable to recall the precise design they had

agreed upon though he remembered a discussion about using clay in connection with the cuts. His March 23 log entry makes no reference to concrete, only to the use of clay. It is undisputed that ECI's representatives at the meeting were silent during the discussion about the slurry cuts. This silence may well have been confirmatory of Foster's recollection of the design, since Christopher Ryan, one of ECI's representatives, in deposition testimony, stated that he would not have recommended a concrete-slurry connection because of vastly different deformability characteristics. We find, therefore, that the design agreed upon at the March 23 meeting contemplated the use of clay in the restorative procedure.

Apart from resolving conflicting testimony as to whether use of clay was envisioned, little, if any, consideration was given by Alden and DuChaine to the slurry repair; and indeed, no detailed instruction as to repair was supplied by Clark-Dietz until Basic installed the pipes. A similar lack of design specificity existed with respect to the installation of reinforcement metal rods, or "rebars," in the collars. Clark-Dietz' sole direction about rebars was an oral approval by DuChaine to the effect that Basic could extend them through the collar and allow the rods to protrude into the slurry. No written plans or specifications were ever submitted. Admittedly, the propriety of this procedure was not checked out or investigated by Clark-Dietz before the work was done by Basic.

At the time its personnel resolved these design questions affecting cement-bentonite slurry, Clark-Dietz possessed a pyramid graph found in the Xanthakos Manual (DB–59), an unpublished report on cement-bentonite slurry. By this graph, one could compute the slurry's unconfined compressive strength, measured in pounds per square inch (p.s.i.). But Clark-Dietz elected not to use this graph. Neither did Clark-Dietz run tests to determine the actual strength of the slurry used by Basic. Though certain testimony indicated that Clark-Dietz had relied upon a letter from Edmund Cardoza of ECI which described

the slurry strength as 90 p.s.i., neither Alden nor DuChaine in fact considered this representation when they decided to use oversized seepage collars. Indeed, it appears that Alden made no effort to determine the suitability of the collar design, either through consultation with slurry experts or other Clark-Dietz specialty engineering personnel. Clark-Dietz' own expert, Dr. George Sowers, a geotechnical engineer, gave convincing testimony that the slurry's strength become important when the decision to cut the levee was made. Though the use of cement-bentonite as a water stop was not imprudent, the weight of the evidence compels the conclusion that Clark-Dietz in September 1977 had available means for properly designing the restoration of the levee, and negligently failed to utilize the then existing engineering knowledge. Indeed, the testimony of Basic's expert, Jean Perez, a geotechnical engineer with extensive slurry experience, established that prudent engineers would have surely considered the strength of the slurry wall before designing any method of restoring the levee's integrity. Accordingly, we find as a fact that Clark-Dietz' failure to properly evaluate characteristics of the cement-bentonite slurry was imprudent engineering.

The materiality of the foregoing omissions is elucidated by Perez who provided two detailed explanations of how the Clark-Dietz design of concrete seepage collars most probably caused rupture of the levee in the pipe cut areas. He found the chief deficiency in design to be the attempt to "marry" the slurry and concrete despite their significantly different physical and mechanical properties. The concrete of the collar was rigid and strong, whereas the cement-bentonite slurry was easily deformable. Perez opined that water pressure against the two materials caused the slurry to yield or "give" to a greater extent than the concrete, thereby permitting seepage paths to develop between the two dissimilar substances. Perez graphically likened the design to a plan for repairing a hole in an inner tube of a bicycle tire by gluing on a quarter rather than a patch of rubber. The six-inch notches into the slurry with the rebars extending into the wall, he maintained, greatly aggravated the piping phenomenon through the increase of multiple cracks in the slurry material. Perez stressed that this process was inevitable even if perfect compaction of clay backfill around the collars had been achieved. He concluded that the floodwater pressure in the natural soils on the outboard side of the levee forced water through the cracks into the erodible natural soil on the inboard side where the piping process occurred.

Perez' second explanation bore upon how the slurry's load-bearing capacity was inadequate to sustain the pressure imparted by both the collars and the soil compacted above the collars. To reach his conclusion, Perez estimated the unconfined compressive strength of the slurry to be 13 p.s.i.; by using a co-efficient of 2.6, he computed the slurry's bearing capacity to be 33 p.s.i. He stated that whenever pressure exerted on the slurry exceeded this figure, failure of the slurry was probable. The recognized practice in the industry, he said, is to maintain a 2.5 minimum safety factor, i.e., the slurry's bearing capacity should be at least 2.5 times greater than the pressure exerted against it. Five factors must be considered in determining external pressure: weight of the collar, weight of the soil, water pressure, settling of the pipe, and the stress concentration of the collar. The expert then calculated the pressure exerted by the collar, soil and water to aggregate at least 32 p.s.i. He reasoned that the remaining factors exerted additional pressure sufficient to crumble the slurry beneath the collar, and create a passage for water seepage. Even if the slurry strength had been 20 p.s.i., a possibility suggested by Professor Sowers, the safety factor would have been no greater than 1.6.

On the subject of known safeguards against the hazards of piping, Perez noted that placement of filters and a drainage system behind the levee would have allowed water seepage to pass through the structure without eroding the embankment. According to Perez, this defensive mechanism

would have prevented piping; moreover, the volume of water passing through the levee would have most likely alerted plant officials to the presence of problems with the linkage between the concrete collar and the cement-bentonite slurry wall. A reasonably prudent design engineer, in Perez' belief, would have provided such a defensive measure in his design of any pipe penetration areas. Pipe trenches are widely known throughout the engineering profession to create preferential flow paths for water intrusion.

The testimony of Dr. Ray Martin, another geotechnical engineer appearing on behalf of Basic, concurred with Perez' conclusions. Indeed, Professor Sowers conceded that a filter drain may have prevented the failures.

We thus conclude that Perez' theories are highly credible, and find as a fact that the vastly different deformability characteristics of concrete and cement-bentonite slurry resulted in the development of seepage paths near the collars which allowed unrestricted piping to occur. We further find that extending rebars beyond the collars into the slurry definitely exacerbated the cracking of the wall and enabled water to pass through more rapidly. Clearly, Clark-Dietz did not consider these deformability characteristics when creating the collar design and it devised no alternative method of either restoring the slurry wall with an adequate safety factor or installing a filter and drainage system as a precautionary measure. The court, therefore, holds that Clark-Dietz' collar design was not reasonably prudent from an engineering standpoint and this deficiency proximately caused the levee failures.

2. *Construction and Inspection.*

Clark-Dietz contends that the piping leading to the levee failures began as a result of Basic's poor workmanship and use of improper materials in the cut areas. Basic responds that if inferior construction contributed to the failures, such was the result of careless supervision and inspection by Clark-Dietz personnel. These contentions are considered together.

Workmanship in the pipe cut areas primarily relates to two facets of the restoration effort: proper forming of the collars and adequate compaction of clay backfill around both collars and pipes. Significantly, the concrete collar at the south levee break remained intact throughout the failure. When the north levee broke, the collar fractured into several pieces, with one part washed 150 feet inside the levee embankment. Donald E. Dixon of Atlanta, Georgia, a professional engineer associated with Law Engineering, and a specialist in concrete, closely examined the collar with respect to the placing, forming and construction of that collar. He noted that the aggregate at the inside bottom of the collar adjacent to the pipe indicated the bottom of the pour did not extend beneath the pipe. Distinguishing this appearance from a break or fracture, he concluded that the collar had not completely encased and surrounded the pipe. Moreover, Dixon considered the concrete to be of poor quality. Professor Sowers also observed the same collar and essentially reached the same conclusions. Sowers contended that such gaps in the collar probably allowed piping to develop.

Nonetheless, DuChaine and Kent Kidwell, a Basic employee, stated that upon the exposure of the north levee collar, they found a fragment of concrete directly underneath the pipe at the place where Sowers and Dixon contended the gap existed. Kidwell recalled positioning the piece of concrete, which he assumed was part of the collar, off to the side of the cut area. While the piece was lost during the cleanup, he identified the fragment in photographs of the break. Furthermore, Kidwell stated that the collar was poured on one side of the pipe until concrete oozed under and around to the other side before the pour was completed. The expert testimony of Martin and Perez supports Kidwell's account since each of them stated that if a gap had existed, or if the concrete had been exceptionally weak, the failure in the north levee would have occurred so rapidly that

the south levee would not have failed. They so concluded by reasoning that the differential floodwater pressures on the outboard and inboard sides of the levee would have been quickly relieved by the north levee break. Even Lind, called as a witness for Clark-Dietz, did not attribute the north levee failure to a gap in the collar. Upon consideration of the evidence as a whole, we hold that no gap existed in the north levee collar prior to the casualty. The testimony about the lost collar fragment, combined with the expert opinions of Martin and Perez, convinces us that an incomplete or weak collar in the north levee would have resulted in a break of the north levee only, with the south levee remaining intact. Accordingly, we find as a fact that Basic's manner of building the collars did not proximately cause or contribute to the levee failures.

Dr. Scholtes, Professor Sowers, and Roger Lind each were of the view that seepage which brought about piping in the cut areas was caused either by improper compaction of clay at the junctures of the collars and the slurry wall or by the use of pervious soils to fill incisions made in the embankment. Lind performed numerous soil borings near the failed areas and found seams of sand in the levee structure near the slurry at the level of the collars. Conducting other borings in the unfailed pipe areas, he discovered the presence of erodable sandy materials near the pipe locations. During one test, Lind lost approximately 400 gallons of boring fluid, which he characterized as a most unusual event. This suggested to Lind the presence of some sort of channel or cavity within the embankment. This expert was of the opinion that if the levee material had been made of compacted clay as required, erosion would not have taken place. Because of these layers of sandy material, Lind surmised that other pipe cut areas would have eventually given way except for the equalization of the outboard and inboard pressures resulting from the levee rupture.

From visual examination of the faces of the washout areas, Dr. Martin found no seams of sand in those areas but only well-compacted soil and alluvial material deposited by the floodwaters. Though confirming the presence of sand seams on top of the slurry wall at different locations within the levee, he theorized that such material had caved in on top of the slurry when the contractor excavated the trench and poured the slurry mix. Since dirt above the slurry was removed to install pipes in the cut areas, any sand material in those areas would necessarily have been similarly removed. Martin therefore reasoned that Lind mistakenly concluded that the sand which came out of natural soil was part of the built-up levee.

In reviewing both Lind's and Martin's soil reports, Professor Sowers and Scholtes hypothesized that poor soil compaction around the collars and the presence of sand materials most likely allowed seepage paths to form, eventually causing the piping phenomenon. Since the floodwaters washed away the soil above the collars and clay backfill, however, we can only review Basic's procedures for repairing the pipe installation cuts and Clark-Dietz' manner of testing and supervision to determine whether poor workmanship by Basic contributed to the levee failure.

Bullard Construction Company, originally scheduled to install the pipes, early withdrew from the project. Basic took over the pipe work and hired Eddie Minor, a former Bullard employee, who had no prior experience with pipes, dirt work, or soil compaction, as pipe foreman. Minor's job entailed compacting clay around the pipes and at the junctures of the collars with the slurry wall. He was in charge of clay compaction until the soil level reached several feet above the collars. Minor's work crew used small pneumatic hand tamps to compact clay around the pipes and in the cramped areas where the slurry met concrete. Larger "one-legged" tamps were used in other locations.

Billy Henson, Clark-Dietz' inspector, supervised most of the pipe installation and compaction of clay backfill, and he approved Basic's use of the pneumatic hand

tamps. On occasions, Henson required Minor to remove and replace pipes and believed that Basic personnel complied with his requests. According to Henson, either he or DuChaine visually inspected all backfilling which came to their knowledge, and approved each step of the work. No soil density tests, however, were performed on backfill laid close to the pipes.

The plans and specifications did not require for the pipes passing through the levee to be bedded on clay material. Foster stated that after the cuts were made, clay was used to fill the overexcavated spots, but that otherwise the pipes were laid on natural soil. Henson and DuChaine considered a clay bedding as the best, but neither objected to the bedding used nor instructed Basic to use clay material.

After the fill reached a level a foot or two above the collars, Kidwell supervised the levee restoration for Basic until the clay fill was completed. Basic continued to restore the levee in lifts of nine inches by means of a bulldozer, disk and sheepsfoot compacter. At each lift, Kidwell secured the approval of either DuChaine or Henson.

Pursuant to DuChaine's instructions, Mississippi Testing Laboratories performed field soil density tests in the pipe cut areas. Most tests showed compaction to be at least 95% of standard proctor. When a compaction was found inadequate, the lift was reworked by Basic until it met the 95% compaction requirement. Although DuChaine did not have regular density tests conducted in all pipe fill areas, he and Henson did employ the "proofrolling" method of inspection. That is, by observing heavy compaction equipment rolling over the soil, they could judge the sufficiency of the compaction, and when compaction was found insufficient, they required Basic to rework that particular area.

Ellis Construction Company (Ellis), Basic's soil subcontractor, obtained the soil from two sources, the Sheffield Pit and Warren Pit. Mississippi Testing performed Atterberg Limits Tests at both sites to determine the soil's plasticity. Finding these results satisfactory, Clark-Dietz specifically

approved soil from both excavations. "Root pickers" were ordinarily provided to remove debris from the dirt; on other occasions Basic had employees extract foreign matter. According to Kidwell, the pipe cut areas were rebuilt with clay from the Sheffield Pit, which was found to be the better source, as well as dirt removed when the cuts were made. Kidwell maintained that only clean materials were used. Despite their occasional complaints of trashy dirt being used in the levee construction, neither DuChaine nor Henson objected to the soil used for refilling the pipe cut areas.

Kidwell and Foster admitted that some wooden forms were not removed before clay was compacted around the concrete collars. Indeed, the post-flood inspections revealed the presence of a greater number of forms. Foster conceded that this was Basic's construction error. Nevertheless, Clark-Dietz' experts did not attribute the levee breaks to the presence of the wooden forms, but expressed the opinion that the forms increased the difficulty of compacting clay around the collars.

Viewing as a whole the evidence bearing upon the restoration of the pipe cuts, we find that Basic's work in those areas did not cause or contribute to the levee failure. Expert opinion to the effect that poor compaction and use of improper materials might have caused the levee to fail is, for several reasons, unpersuasive. Henson and DuChaine supervised Basic's restoration efforts and required it to rework those aspects of the job judged to be unacceptable either upon testing or visual inspection. The materials used to repair the cuts came primarily from the Sheffield Pit approved by Clark-Dietz. Logically, any sand material deposited above the slurry wall during its pouring would have been removed when the wall was cut for the pipe installation. Indeed, both DuChaine and Henson acknowledged that except for the final pipe pressure testing, they would have recommended the City's acceptance of the levee.

We deem it highly unlikely that Basic's work, performed under Clark-Dietz' supervision, would have been deficient in all pipe

crossing locations to such an extent that it would have caused two complete ruptures and substantial erosion at the other pipe penetrations. According to Perez, such a high rate of failure necessarily indicates design deficiency. As Perez stated, levee failure was inevitable because of the poor collar design. As we have found, the seepage leading to the fatal piping occurred through the slurry wall in the natural soils *below* the embankment; hence the quality of the soil and degree of compaction within the embankment above natural grade could have no causative connection or effect with the levee failure. It is sufficient that we shall critically evaluate Basic's workmanship in constructing the embankment with respect to the necessity for installing the second slurry wall. Moreover, even perfect compaction, had it been achieved by Basic, around the collar in the natural soil would not have prevented predictable development of seepage between the concrete and slurry material. The different theories of the piping causation espoused by Lind, Scholtes and Sowers appear plausible when considered in a vacuum. When viewed alongside the more logical explanation of Perez and Martin as to design deficiency, however, their theories are rendered conjectural for lack of support in credible evidence. Accordingly, we find as a fact that Basic properly restored the levee cuts pursuant to Clark-Dietz' explicit instructions. Furthermore, we find that Basic's work did not contribute to the levee breaks, and that Clark-Dietz' defective design was the sole proximate cause of the failures.

## C. THE SECOND SLURRY WALL

As a separate and distinct issue, the court must resolve factual disputes concerning the need of and responsibility for an additional slurry wall installed after the flood in the unfailed portions of the levee. This second wall connected with the original slurry wall at ground level and extended upward to the levee's crest. Basic constructed this wall under protest, claiming that a toe drain and filter were enough to insure the levee's strength.

Two basic factual questions must be answered to resolve the second slurry wall issue. First, was an additional wall necessary to maintain the levee's integrity? Second, was the presence of sand material in the embankment the result of Clark-Dietz' design, Clark-Dietz' inspection and supervision, Basic's construction, or by a combination of these factors?

All parties agree that post-failure inspection revealed seams of sand in the levee embankment immediately above the slurry. Lind's soil borings indicated these sand seams to be in most locations, bridging the permeable natural soils on both sides of the slurry wall. Though Martin disputed the extent of the sand material, he confirmed its existence in several locations and recommended some type of remedial measure. The significant dispute between Lind and Martin concerns the quality of the soil material in the embankment *above* the seams of sand. The plans and specifications required the embankment to be of clayey cohesive soil, compacted to 95% of standard proctor, with a plasticity index within the range of 18 to 25 with a coefficient of permeability of $10-6$ centimeters per second. Plasticity (PI) is a measure of clay content and quality by quantifying the difference between the soil's liquid and plastic limits. PI is a good indicator of the soil's erosiveness: the higher the PI, the less erosive it tends to be. Permeability is the soil's ability to prevent the flow of water. The degree or coefficient of permeability is influenced by the PI, but soil with a low PI may attain the same degree of permeability because of greater density of its compaction.

Martin's test borings disclosed that the embankment material failed to meet the PI requirement of 18–25. Nevertheless, Martin averaged the permeability of his borings, exclusive of the sand seams, to conclude that the embankment met the required $10-6$ coefficient of permeability. Permeability, he stated, was the key measurement. In his opinion, the plasticity levels were specified as a means of attaining the $10-6$ coefficient of permeability, and it was not otherwise important. Since the

10–6 coefficient of permeability was achieved, he felt that Basic had complied with the intent of the specifications.

Lind and Sowers strenuously disputed Martin's conclusions. Each opined that the purpose of specifying a plasticity index range between 18 and 25 was to insure the use of clay material both impermeable and nonerosive. They recognized the importance of the 10–6 coefficient of permeability, but emphasized that sandy clay material can be compacted to attain this requirement and yet be erosive. Sowers supported his opinion by reference to the Teton Dam disaster which involved an embankment with a low permeability and a PI of only 2. The failure of the Teton Dam was attributed to soil with a low PI which permitted extensive erosion.

Sowers further attacked Martin's method of arriving at the levee's coefficient of permeability based upon averaging the results of test borings. According to Sowers, the "weakest link" theory applies to levees—a levee is no stronger than its weakest point. If it fails, he stated, it will do so at that weakest link, regardless of the construction of the remaining portions. This theory, he continued, requires that the permeability test results of each boring be considered separately and not averaged together. Finally, Sowers could find no rational basis to exclude the sand seams above the slurry wall from his computations other than to manipulate and distort the permeability results. We find the testimony of Sowers and Lind to be credible and hold that the soil in the levee did not comply with the intent of the plans and specifications requiring a PI of 18 to 25.

If the insufficient low plasticity material had existed only in the areas immediately above the slurry wall, the installation of toe drains and filters as suggested by Martin would perhaps have been adequate to strengthen the levee. Because unacceptable soils were prevalent throughout the levee, however, we agree with Sowers that the drains and filters would not suffice to contain seepage problems. Furthermore, the installation of toe drains would have required maintenance by the City, for which it did not contract. Accordingly, we find that the construction of a second slurry wall was a necessary and reasonable remedial construction procedure.

Finding the additional slurry wall to have been necessary, we now consider to whom we should attribute the presence of soil of low plasticity found in the levee. Basic asserts that sand seams immediately above the slurry wall were caused by Clark-Dietz' failure to specify the use of guidewalls to prevent the sand and gravel natural soil from crumbling on top of the slurry wall. Goldman, Clark-Dietz' designer, consulted with slurry specialists regarding the use and construction of the slurry wall. Mr. Kishioka, a slurry expert, supplied Goldman with draft specifications, including drawings showing guide walls which should be used in a slurry trench constructed in pervious materials such as sands and gravels. Nevertheless, Goldman did not mention or refer to guidewalls in either the 1974 or 1975 designs. According to Goldman, he intended, in a cross-section drawing of the slurry trench and impervious clay embankment (G–13), merely to show the contractor what the end result should be. He considered it up to the contractor to best determine how to follow the design. Goldman assumed that the contractor would install a layer, or key, of clay before digging the slurry trench, and that the slurry would be poured to the top of the clay key. He "envisioned" that the contractor would take steps necessary to prevent trench collapse. He could not remember if he informed anyone of his idea as to how the clay blanket should be laid before the trench was dug.

All experts agreed that the connection between the top of the slurry wall and the clay embankment was critical. Perez concurred with Goldman that a clay blanket should have been laid before the slurry trench was dug, but Perez considered this to be a matter of design that should have been communicated to Basic. Also believing that this was a design question, Lind testified that a prudent design engineer would give the contractor definite instruc-

tions on how to make the connection. While Lind, on the one hand, considered drawing G–13 to be sufficient, Perez characterized G–13 as showing no more than a cross-section of the levee without providing any design information.

DuChaine, present when the slurry wall was poured, considered pouring the slurry directly into the natural soil to be proper and meeting specifications. After the slurry was poured, Basic attempted to notch the slurry into the clay as shown in G–13, but discovered the slurry too weak for this to be accomplished. Therefore, without objection by DuChaine, Basic proceeded to build up clay on each side of the trench and fill clay in the space above the slurry wall. According to Foster and Kidwell, DuChaine approved this procedure. DuChaine considered the manner of keying the levee into the slurry a construction question which the contractor was required to resolve.

We agree with Basic's contention that the method of keying the slurry into the embankment is a function of levee design. The evidence is clear that the Clark-Dietz designer contemplated that a clay blanket be laid before the digging of the slurry trench. Nevertheless, his subjective intention as designer was not communicated to the contractor anywhere in the plans or specifications or in the field. DuChaine, also unaware of the designer's intention, allowed the slurry trench to be installed before a clay bed was laid. Though this aspect of the design was extremely important, it was lightly treated by Clark-Dietz. Accordingly, we find as a fact that Clark-Dietz acted with imprudence in designing the key of the slurry into the embankment and during the supervision of its construction by Basic. This omission allowed sand to collapse from the trench walls and create seams of sand between the slurry wall and embankment at numerous locations throughout the levee. Accordingly, we further find as a fact Clark-Dietz' defective design proximately caused these sand seams to develop and render necessary restorative work on the levee.

The soil in the embankment above the sand seams is another matter. Again, however, Basic contends that Clark-Dietz committed design error by failing to properly consider the quality of local soils to be used for the levee construction. In addition, Basic asserts that Clark-Dietz negligently supervised construction by approving the use of low plasticity material in the embankment. Both contentions are without merit and unsupported by the evidence. Clark-Dietz had Atterberg Limits Tests conducted in the dirt source pits which showed the availability of proper soil. Furthermore, Clark-Dietz specifically approved the use of dirt from the particular pits where the clay soil was found to exist. When it appeared during construction that dirt of a lower quality was being utilized, DuChaine required all material for the levee core to come from the superior Sheffield Pit. Consequently, we find as a fact that Clark-Dietz adequately considered the availability of proper soil for use in its levee design.

It is the custom and practice in the levee construction industry for one contracting party to control soil testing, and the universal practice is for the contractor to rely upon testing when controlled by the owner's representative. Here, Clark-Dietz controlled testing on behalf of the City, thus Basic rightfully relied upon the tests performed by Clark-Dietz. We find, however, that Clark-Dietz adequately supervised and tested Basic's work throughout construction of the embankment. Numerous soil density tests were taken, and DuChaine and Henson made continual visual inspections. When a compaction of a lift of soil proved unsatisfactory, DuChaine and Henson required Basic to rework the lift. Post flood testing confirmed that in most locations, compaction was adequate. Though low plasticity material was placed in the embankment, its existence cannot be attributed to Clark-Dietz. As stated above, Clark-Dietz tested the dirt material from certain sources at another location and approved its use. When dirt quality appeared questionable, DuChaine ordered its discontinuation in the core area. It is unreasonable to conclude Clark-Dietz could have

tested the plasticity of every truckload of dirt used in the embankment, and thus guarantee Basic's construction. Therefore, we find as a fact that Clark-Dietz adequately supervised and tested the embankment construction. The responsibility for use of materials in the embankment not meeting the requirements of the plans and specifications must be borne by Basic.

In summary, we find that deficiencies in the unfailed areas of the levee were proximately caused by both Basic and Clark-Dietz. Moreover, since it appears that the deficiencies fairly attributable to each defendant are of equal dimension, we apportion responsibility for the installation of the second slurry wall as 50% chargeable to Basic and 50% chargeable to Clark-Dietz.

### D. McCRARY CREEK ACCESS BRIDGE

The project required the construction of an access bridge across McCrary Creek located on the south side of the plant. The bridge design called for the construction of slope paving on the creek's bank at the northeast corner of the bridge. After the parties stipulated that Basic properly paved the slope, the court granted Basic judgment on the pleadings on this issue. The slope paving failed twice because of soil erosion. After the second failure, Clark-Dietz designed a piling method of construction which solved the problem.

The bridge was inspected by three professional Clark-Dietz engineers, G.W. Miller, Darrell Berry and Alex Dimitrief. Miller and Berry indicated that they thought the bridge design was adequate, but Dimitrief's report dated November 21, 1979, clearly attributed the slope problems to the bridge placement and the use of noncohesive soils in the embankment under the pavement. This report provides in part:

In my opinion the primary cause of the failure is the undermining of the northeast slope wall revetment during the high velocity floods. It appears that the bridge, as located, is not centered in respect to the main channel and during the high flow, the water hits directly the northeast embankment cone with high velocity causing undercurrents which undermine the revetment and erode the embankment cone material which consists of non-cohesive soils.

Drawing G–5 illustrates the flow of the creek channel directly onto the embankment at the northeast abutment. This drawing clearly establishes that Clark-Dietz had knowledge of the direction of water flow at the time the bridge was designed and there was no unexpected change of course, as contended by Clark-Dietz. We resolve the dispute among Clark-Dietz' technical experts against Clark-Dietz.

Dimitrief's report and drawing G–5 clearly show that the bridge placement and design were defective and that Clark-Dietz was negligent in this respect. Therefore, we find as a fact that Clark-Dietz is solely responsible for all damages arising from bridge design errors and must alone bear all liability arising therefrom.

## II. LAW

At the outset we note that the substantive law of Mississippi governs this diversity action since the contractual and tortious activity giving rise to litigation occurred within the state. The triune issues of liability encompassing the City, Clark-Dietz and Basic are bottomed upon duties arising from both tort and contract. At the vertex of this triangle lies Clark-Dietz' design and the challenge to its sufficiency. Since this central issue predominates and determines the greater portion of liability in this action, we consider it first.

 Mississippi law requires that an architect "exercise ordinary professional skill and diligence." *Board of Trustees, Utica Junior College v. Lee Electric Co.,* 198 So.2d 231, 234 (Miss.1967). An architect is bound by the general standards applicable to practitioners of other professions.

[T]he professional engineer or architect, like other professionals, owes a special duty to his client to perform his services with "that degree of knowledge, skill and judgment, ordinarily possessed by mem-

bers of that profession, and to perform faithfully and diligently any service undertaken as an architect in the manner a reasonably prudent architect would under the same or similar circumstances."

*City of Aurora, Colorado v. Bechtel Corp.,* 599 F.2d 382, 389 (10 Cir.1979); *see Bayshore Development Co. v. Bondfoey,* 75 Fla. 455, 78 So. 507 (1918); G. Witherspoon, *When is an Architect Liable?,* 32 Miss.L.J. 40 (1960). The evidence adduced at trial and discussed *supra* establishes that Clark-Dietz failed to attain this standard of professional engineering practice in its design of the concrete collars in the pipe cut restorations, the clay key between the slurry wall and embankment, and the McCrary Creek access bridge.

 Since an architect's duty to exercise professional engineering judgment is nondelegable, any reliance by Clark-Dietz on information provided by ECI or other specialty firms concerning cement-bentonite slurry is legally irrelevant. *State Board of Registration for Professional Engineers v. Rogers,* 120 So.2d 772 (Miss.1960). Although an architect does not guarantee his design or the final work product unless he so contracts, he is responsible for his own work and warrants that he has exercised ordinary professional skill and diligence. *Kelley v. Bank Building and Equipment Corp. of America,* 453 F.2d 774, 777 (10 Cir.1972); *see Baton Rouge Contracting Co. v. West Hatchie Drainage District,* 304 F.Supp. 580, 585 n. 5 (N.D.Miss.1969), *aff'd,* 436 F.2d 976 (5 Cir.1971). As stated in *St. Joseph Hospital v. Corbetta Construction Co., Inc.,* 21 Ill.App.3d 925, 316 N.E.2d 51 (1974), a case in which the architect made no investigation to determine whether specified materials called for in his design met the proper standard:

"It ill behooves a man professing professional skill to say I know nothing of an article which I am called upon to use in the practice of my profession."

*Id.* at 64.

 The architect's duty to provide a sufficient design, of course, flows to the owner by virtue of his contractual obliga-

tions. *E.g., Board of Trustees, Utica Junior College v. Lee Electric Co., supra.* Because of this contractual obligation to the owner, the architect owes a further duty, sounding in tort, to the contractor who relies upon the design to his economic detriment. *Owen v. Dodd,* 431 F.Supp. 1239, 1242 (N.D. Miss.1977); *see Engle Acoustic & Tile, Inc. v. Grenfell,* 223 So.2d 613 (Miss.1969). Prosser succinctly described the relationship as follows:

[B]y entering into a contract with A, the defendant may place himself in such a relation toward B that the law will impose upon him an obligation, sounding in tort and not in contract, to act in such a way that B will not be injured. The incidental fact of the existence of the contract with A does not negative the responsibility of the actor when he enters upon a course of affirmative conduct which may be expected to affect the interests of another person.

W. Prosser, Handbook of The Law of Torts, § 93, p. 622 (4th ed. 1971). Accordingly, by breach of its contractual duty to the City to provide an adequate levee and bridge design, Clark-Dietz breached a tort duty to Basic and is liable to Basic for the extra construction expenses proximately caused by the negligent design. *See A.R. Moyer, Inc. v. Graham,* 285 So.2d 397, 401–02 (Fla. 1973); *Shoffner Industries, Inc. v. W.B. Lloyd Construction Co.,* 42 N.C.App. 259, 257 S.E.2d 50, 55 (1979).

 At another angle in this triangular relationship lies Basic's duty to the City to construct the waste treatment plant according to plans and specifications in a workmanlike manner. The construction contract between Basic and the City, ¶ 2, entitled "Scope of Work," provides as follows:

The contractor shall provide and furnish all the necessary labor, supervision, materials, tools, expendable and permanent equipment, and all utility and transportation services required to perform, and shall perform and complete in a workmanlike manner, all of the work ....

All work shall be performed in strict accordance with the drawings and specifications prepared by Clark-Dietz and Associates Engineers, Inc., acting as and in these contract documents referred to as the engineer/architect, which drawings and specifications are made a part of this contract, and in strict compliance with the contractor's proposal as accepted, including any amendments agreed upon at the time of the execution of this agreement, and with the other contract documents herein mentioned which are a part of this contract.

Article 10 of the contract states:

All materials and workmanship shall be guaranteed by the Contractor and the Surety for a period of one year from date of final acceptance. . . .

By this contractual language, Basic warranted that it would perform its work in strict accordance with the plans and specifications with the degree of workmanship normally possessed by those in the industry. *Johnson v. Knight,* 459 F.Supp. 962, 967 (N.D.Miss.1978) (applying Alabama law); *see* 13 Am.Jur.2d, *Building and Construction Contracts* § 27 (1964). The law imposes this warranty upon the contractor even though the performance of the contract may subsequently become unexpectedly burdensome or most difficult. *Browne & Bryan Lumber Co. v. Toney,* 188 Miss. 71, 194 So. 296 (1940); *Piaggio v. Somerville,* 119 Miss. 6, 80 So. 342 (1919). Nonetheless, if, without fault on his part, the contractor fulfills his obligations to complete the work in accordance with plans and specifications provided by the owner, he is not responsible for the adequacy of the final product. *Baton Rouge Construction Co., supra; Trustees of First Baptist Church, Corinth, Miss. v. McElroy,* 223 Miss. 327, 78 So.2d 138 (1955); *Havard v. Board of Supervisors,* 220 Miss. 359, 70 So.2d 875 (1954). In *Trustees of First Baptist Church,* the applicable principle is thus stated:

The rule has become well settled, in practically every American jurisdiction in which the matter has been involved, that a construction contractor who has fol-lowed plans or specifications furnished by the contractee, his architect or engineer, and which have proved to be defective or insufficient, will not be responsible to the contractee for loss or damage which results solely from the defective or insufficient plans or specifications, in the absence of negligence on the contractor's part, or any express warranty by him as to their being sufficient or free from defects.

78 So.2d at 141. Since we have found that Clark-Dietz' defective design of the concrete collars in the pipe restoration areas was the sole proximate cause of the levee failure, and that the defective design of the access bridge was likewise the sole proximate cause of additional bridge work, Basic cannot be held responsible for loss resulting from these defects. Basic's express warranty clearly did not guarantee the adequacy of the design supplied by Clark-Dietz.

A third aspect of the triangular configuration relates to the duty of the City to provide Basic adequate plans and specifications with which to construct the plant. Basic not only is free from responsibility for the adequacy of the owner's plans and specifications, but also may charge the City with liability for expenses incurred because of the defectiveness of the plans and specifications. *MacKnight Flintic Stone Co. v. The Mayor,* 160 N.Y. 72, 54 N.E. 661 (1899); *Condon-Cunningham, Inc. v. Day,* 22 Ohio Misc. 71, 258 N.E.2d 264 (1969). As the Mississippi Supreme Court has stated:

The majority of the cases base it on an implied warranty by the owner that the plans or specifications are suitable for the particular purpose coupled with an absence of express warranty by the contractor in regard to the sufficiency of the plans or specifications.

*Trustees of the First Baptist Church, Corinth, Miss., supra,* at 141. Clark-Dietz, who supplied the defective design, is the agent of the City, thus causing liability to flow from the City to Basic. *See Miller v. City of Broken Arrow, Okla.,* 660 F.2d 450 (10 Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982).

■ Basic also asserts that despite our finding that its poor workmanship and use of improper soil materials in the levee was partly responsible for the necessity of a second slurry wall, Clark-Dietz should bear full responsibility. Basic contends that Clark-Dietz, by supervising construction, performing soil tests and approving work on a lift by lift basis, accepted *all* work as complying with plans and specifications. To determine the extent of Clark-Dietz' duty to Basic for supervision, we must first examine the pertinent contract provisions. Sections of the construction contract provide:

5. AUTHORITY AND RESPONSIBILITY OF THE ENGINEER/ARCHITECT

All work shall be done under the general supervision of the Engineer/Architect. The Engineer/Architect shall decide any and all questions which may arise as to the quality and acceptability of material furnished, work performed, rate of progress of work, interpretation of Drawings and Specifications, and all questions as to the acceptable fulfillment of the Contract on the part of the Contractor.

ARTICLE 7. THE ENGINEER'S STATUS:

The Engineer shall have general supervision and direction of the Work. He is the Agent of the Owner only to the extent provided in the Contract Documents. He has authority to stop the Work whenever such stoppage may be necessary to insure proper execution of the Contract.

ARTICLE 11. INSPECTION OF WORK:

.　　.　　.　　.　　.

At any time during the course of construction of this project when, in the opinion of the Engineer, provisions of the Plans, Specifications or Contract Conditions are being violated by the Contractor or his employees, the Engineer shall have the right and authority to order all construction to cease or materials to be removed, until arrangements satisfactory to the Engineer are made by the Contractor for resumption of the Work in compliance with the provisions of the Contract. It shall not be construed as a waiver of defects if the Engineer shall not order the Work stopped or more material removed, as the case may be.

.　　.　　.　　.　　.

Other contractual provisions deal with the approval of compaction equipment, testing soil in the borrow pits, and the owner's right to perform soil density tests. These provisions give Clark-Dietz considerable authority to evaluate Basic's work and bring construction to a halt should it deem such action necessary. Unquestionably, Basic cannot be held responsible for work done as Clark-Dietz explicitly required and/or approved. Oral directions of DuChaine and Henson, at variance with the written plans and specifications, such as the clay key between the slurry wall and embankment, were actually field modifications of the plans and specifications; and by following them, Basic constructed the project in accordance with the plans and specifications. *See Fuchs v. Parsons Construction Co.,* 172 Neb. 719, 111 N.W.2d 727, 731 (1961); *Mannella v. City of Pittsburgh,* 334 Pa. 396, 6 A.2d 70, 72 n. 1 (1939). Furthermore, once Clark-Dietz undertook to perform soil tests and supervise Basic's work, the law imposed a duty on Clark-Dietz to discharge such activities with reasonable care. *Shoffner Industries, Inc., supra.*

The law imposes upon every person who enters upon an active course of conduct the positive duty to use ordinary care so as to protect others from harm. A violation of that duty is negligence. It is immaterial whether the person acts in his own behalf or under contract with another.

257 S.E.2d at 55. Since Clark-Dietz exercised extensive control over the project, Basic had the right to rely on specific approval of its work and testing results provided by Clark-Dietz. *State v. Malvaney,* 221 Miss. 190, 72 So.2d 424 (1954); *Higgins Lumber Co. v. Rosamond,* 217 Miss. 1, 63 So.2d 408 (1953).

■ Any duty of Clark-Dietz to Basic for supervising construction in the first in-

stance is dependent upon the obligations owed by Clark-Dietz to the City. *Reber v. Chandler High School District,* 13 Ariz.App. 133, 474 P.2d 852, 854–55 (1970); *see* Note: Torts—Architect's Liability in his Capacity as a Supervisor, 17 De Paul L.Rev. 439, 441 (1968). This makes relevant various provisions of the agreement for professional services made by the City with Clark-Dietz:

Paragraph 1.6.2 [The engineer will] [m]ake periodic visits to the site to observe the progress and quality of the executed work and to determine in general if the work is proceeding in accordance with the contract documents; he will not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the work; . . . but he will not be responsible for the contractor's failure to perform the construction work in accordance with the contract documents . . . .

Paragraph 1.6.7 The engineer shall not be responsible for the acts or omissions of the contractor, any sub-contractor or any of the contractor's or sub-contractor's agents or employees or any other persons performing any of the work under the construction contract.

Paragraph 6.6 Nothing herein shall be construed as creating any personal liability on the part of any officer or agent of any public body which may be a party hereto, nor shall it be construed as giving any rights or benefits hereunder to anyone other than the owner and the engineer.

These paragraphs unambiguously limit Clark-Dietz' duty for supervising construction to an obligation to observe the general progress of the work, and not to make continuous and exhaustive inspections. We hold that Clark-Dietz performed this contractual duty by generally overseeing construction and conducting soil tests with reasonable care. *See Dickerson Construction Co., Inc. v. Process Engineering Co., Inc.,* 341 So.2d 646, 652 (Miss.1977).

■ The language in the Clark-Dietz—City contract clearly does not create a requirement for Clark-Dietz to inspect and verify every step of Basic's work. In the absence of an active undertaking to guarantee the contractor's work, courts have ordinarily held that similar language absolves the architect of any liability for the contractor's poor workmanship. *J & J Electric, Inc. v. Gilbert H. Moen Co.,* 9 Wash.App. 954, 516 P.2d 217, 227 (1973); *Vonasek v. Hirsch and Stevens, Inc.,* 65 Wis.2d 1, 221 N.W.2d 815, 820 (1974). Thus, we hold that Clark-Dietz owed no duty of supervision to Basic other than to exercise reasonable care when it provided instructions and test results at the job site. Having found that Clark-Dietz was not negligent in these respects, Basic must bear responsibility for the unacceptable soil material found in the embankment except for sand seams directly above the slurry wall, and is liable to the City for damages resulting therefrom. As discussed earlier, the presence of sand seams immediately above the slurry wall was a proximate result of Clark-Dietz' defective design for which Basic is not liable.

■ Basic's cross-claims against Clark-Dietz, however, bring into play Mississippi's comparative negligence statute, Miss.Code Ann. § 11–7–15 (1972). Pursuant to the statute, we have apportioned liability in favor of the City for installation of the second slurry wall to be 50% against Clark-Dietz and 50% against Basic. Clark-Dietz must bear sole responsibility to the City for damages resulting from the levee failures as well as repairs to the McCrary Creek access bridge.

In summary, we hold liability among the parties to exist as follows: The City and Clark-Dietz are jointly and severally liable to Basic for all damages proximately caused by the three design defects: the concrete collars in the pipe cuts, the clay key between the slurry wall and embankment, and the McCrary Creek access bridge. Clark-Dietz is also liable to the City for all damages caused to it by the said three defects in the plans and specifications. Basic is liable to the City for 50% of the cost of the second slurry wall. The City is not liable to Clark-Dietz for any services performed as extra work under the contract documents

other than 50% of a reasonable supervision charge for installing the second slurry wall. At this juncture of the litigation, the court does not determine what expenses have been incurred by, or what payments have been made to, the parties in prosecution of the work to completion pursuant to our injunctive order entered June 20, 1979, the relevant portion of which states:

> That the defendants be, and they hereby are, enjoined to go forward to complete the Columbus Waste Water Treatment Project without interference, interruption or delay with full reservation of rights of both defendants against each other and against the plaintiffs, and any claims of the plaintiffs against either or both of the defendants.

Computation of damages in accordance with this opinion is reserved for future disposition.

Let an order issue accordingly.