297 S.E.2d 854

STAR FURNITURE CO. and Fireman's Fund American Ins. Co.

v.

PULASKI FURNITURE CO., etc.

No. CC934.

Supreme Court of Appeals of West Virginia.

Nov. 18, 1982.

Stephen A. Weber and Jeffrey M. Wakefield, Kay, Casto & Chaney, Charleston, for plaintiffs.

John F. Wood, Jr., Wood, Grimm & Delp, Huntington, for defendants.

McGRAW, Justice:

This proceeding is before this Court as a result of the certification of three questions

of law from the United States District Court for the Southern District of West Virginia. W.Va.Code § 51–1A–1 (1981 Repl.Vol.), the Uniform Certification of Question of Law Act, authorizes the Court to accept such certifications.[1]

The certified questions present issues which are natural outgrowths of our decisions in *Morningstar v. Black and Decker Manufacturing Co.*, 162 W.Va. 857, 253 S.E.2d 666 (1979), and *Bradley v. Appalachian Power Co.*, 163 W.Va. 332, 256 S.E.2d 879 (1979). In *Morningstar*, this Court adopted the doctrine of strict liability in tort in products liability litigation. Soon afterwards, the Court embraced the doctrine of comparative negligence in *Bradley*.

The present case involves both doctrines. We have been asked to decide whether strict liability in tort applies when recovery is sought only for property damage rather than personal injury, whether strict liability is available to a commercial entity and its insurer as plaintiffs, and whether comparative negligence may be asserted as an affirmative defense in strict liability actions. We will discuss each question in turn.

The plaintiffs in this case are Star Furniture Co. [Star] and its insurance company, Fireman's Fund of America [Fireman's Fund].[2] Pulaski Furniture Co. [Pulaski], a Virginia corporation, and another out-of-state corporation, Hemco Corp. [Hemco],[3] are defendants.

The events leading to the institution of this case are not in dispute. Plaintiff Star purchased a "Curio" clock from defendant Pulaski in December, 1974, apparently for display and retail purposes. The clock's component parts were manufactured by Hemco. A fire damaged Star's business establishment September 13, 1975. Star claims that the fire resulted from a malfunction in the clock or its wiring.

In September, 1977, Star instituted the present action to recover $160,112.57 in damages. The company based its claims on negligence, strict liability in tort and breach of express and implied warranties. In its answer, Pulaski denied that the fire resulted from a clock or wiring malfunction, and pleaded the affirmative defenses of comparative negligence and assumption of risk.

I.

The first certified question asks whether the doctrine of strict liability may be used when recovery is sought solely for property damage as opposed to cases in which some physical injury is alleged. We answer that question in the affirmative.

In *Morningstar, supra*, the Court traced the development of strict liability both nationally and in West Virginia. Strict liability in tort became a recognized doctrine with the California Supreme Court's decision in *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963), and in the formulation of section 402A of the *Restatement, (Second), Torts* (1965). The California and Restatement approaches differ because California has deleted the Restatement's requirement that the product be in a defective condition "unreasonably dangerous to the user or consumer or to his property ...." *Restatement, (Second), Torts*, § 402A. In *Morningstar*, we followed California's lead, holding that "the general test for establishing strict liability in tort is whether the involved product is defective in the sense that it is not reasonably safe for its intended use." 162 W.Va. at 875, 253 S.E.2d at 683.

1. W.Va.Code § 51–1A–1 provides:
      The supreme court of appeals of West Virginia may answer questions of law certified to it by the Supreme Court of the United States, a court of appeals of the United States, a United States district court or the highest appellate court or the intermediate appellate court of any other state, when requested by the certifying court if there are involved in any proceeding before it questions of law of this State which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court of appeals of this State.

2. Fireman's Fund was joined as a plaintiff upon the motion of Pulaski Furniture Co. pursuant to Rule 17(a), Federal Rules of Civil Procedure.

3. The respondent Hemco Corp. has not appeared in this case and did not participate in the consideration of the certified questions.

The philosophical underpinning of strict liability "is to insure that the costs of injuries resulting from defective products are borne by the manufacturer that put such products on the market rather than by the injured persons who are powerless to protect themselves." *Greenman*, 59 Cal.2d at 63, 27 Cal.Rptr. at 701, 377 P.2d at 901. This rationale results from the belief that manufacturers may spread the cost of compensating such injuries to society by including the cost of insurance or judgments as part of the product's price tag. This theory is often referred to as the risk distribution principle. Still, the term strict liability in tort actually is misleading. As we noted in *Morningstar*, strict liability "does not impose absolute liability or make the manufacturer an insurer of his product." 162 W.Va. at 868, 253 S.E.2d at 677. Rather, the doctrine makes it less difficult for injured consumers to prove their cases.

> The cause of action covered by the term "strict liability in tort" is designed to relieve the plaintiff from proving that the manufacturer was negligent in some particular fashion during the manufacturing process and to permit proof of the defective condition of the product as the principal basis of liability.

*Id.* Additionally, the need to release consumers from having to overcome affirmative defenses provided manufacturers by the Uniform Commercial Code often has been cited as spurring the development of strict liability. These technical requirements include notice of breach of warranty, disclaimers of liability, and privity. *Id., citing Dippel v. Sciano*, 37 Wis.2d 443, 459–60, 155 N.W.2d 55, 63 (1967).

The parties agree that the risk distribution principle underlying strict liability applies to circumstances in which the consumer suffers only property damage. Ability to utilize strict liability does not depend on the fortunate fact that the defective product did not result in personal injury. To permit such a distinction would penalize the fortunate who escape personal injury.

■ As the parties have pointed out, both jurisdictions which have adopted California's formulation of strict liability in *Greenman* and those which have followed the *Restatement's* approach in Section 402A have permitted plaintiffs to recover for property damage. California extended strict liability to property damage only two years after explicitly recognizing strict liability in *Greenman*. *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965). *Restatement* jurisdictions have had no difficulty in applying strict liability to such cases because the very terms of Section 402A provide for such recovery. "One who sells any product in a defective condition unreasonably dangerous to the user or consumer *or to his property* is subject to liability for physical harm thereby caused to the ultimate user *or to his property* . . . ." [Emphasis added]. Therefore, we adopt the rule that strict liability in tort may be used to recover for property damage when the defective product damages property only.

Although the parties agree that we should adopt this rule, they disagree on the scope of the term "property damage." The petitioner, Star, argues that damages resulting from harm to the defective product itself should be recoverable in a strict liability cause of action. The respondents appear to argue, however, that utilization of strict liability should be limited to recovery for damage to property other than the defective product and should also exclude claimed consequential damages such as alleged lost profits.

The need to define "property damage" is evident from cases decided in other jurisdictions. Plaintiffs generally have attempted to place three distinct types of harm under the property damage umbrella: damage to property other than the defective product, damage to the defective product, and loss of goodwill or profits.

■ The first category is the type of damage most often encountered in such actions for strict liability. In this jurisdiction, plaintiffs may utilize a strict liability cause of action to recover for damage to property other than the defective product. This is the unanimous view in other jurisdictions. *See, e.g., Cloud v. Kit Manufacturing Co.*, 563 P.2d 248 (Alaska 1977);

*Shields v. Morton Chemical Co.*, 95 Idaho 674, 518 P.2d 857 (1974). *See generally* W. Prosser, *Law of Torts* § 101 (4th ed. 1971).

Unanimity of opinion disappears, however, when application of strict liability is suggested for damage to the defective product itself or such commercial harm as loss of profits. These injuries are often characterized as "economic loss," although of different types. Damage to the defective product has been labeled "direct economic loss"—"the difference between the value of what is received and its value as received." S. Birnbaum, *Disclaimers of Warranties, Limitation of Remedy, Liability of Successor Corporations and Economic Loss*, [1981] Product Liability Update 156 (Practicing Law Institute). Lost profits, however, are classified as "consequential economic loss"—"indirect loss resulting from the inability to make use of the defective product." *Id.* In this regard, loss of profits as consequential damages is transplanted from the fields of contract and commercial sales law. *See, e.g.,* W.Va. Code § 46–2–715(2) (1966).

The difficulty in determining whether to apply strict liability for any type of economic loss results from the tension between the tort doctrine of strict liability and contract theory embodied in the Uniform Commercial Code. "Contract law has been traditionally concerned with the fulfillment of reasonable economic expectations. Tort law, on the other hand, is concerned with the safety of products and the corresponding quantum of care required of a manufacturer." *Northern Power and Engineering Corp. v. Caterpillar Tractor Co.*, 623 P.2d 324, 328 (Alaska 1981). This tension is a natural outgrowth of the replacement of warranty causes of action and the requirement of privity with strict liability which began in *McPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916), and reached full bloom in *Greenman v. Yuba Power Products, Inc., supra.*

The petitioner's argument regarding injury to a defective product is very straight forward. Star owns the defective product just as it owns other property damaged by the fire allegedly caused by the defective product. Therefore, the damage to the defective product should be treated as is damage to other property. The respondent appears to classify injury to the defective product with commercial losses, but its position on this issue is unclear.

A majority of courts which have considered the applicability of strict liability to recover damages to the defective product itself have permitted use of the doctrine, at least where the damage occurred as a result of a sudden violent event and not as the result of an inherent defect which reduced the property's value without inflicting physical harm to the product.

Two cases decided by the Alaska Supreme Court illustrate the difference in types of damage and the necessity of distinguishing between tort and warranty causes of action. In *Morrow v. New Moon Homes, Inc.*, 548 P.2d 279 (Alaska 1976), the plaintiff purchased a mobile home and proceeded to occupy it. He soon discovered that the roof leaked continually and that it suffered numerous other failings. Although it was unpleasant to live in the mobile home, its problems did not pose a hazard to life or property. The Alaska court refused to allow Morrow to use a strict liability theory when he sued the manufacturer. Instead, Morrow was forced to employ a warranty theory to recover for breach of the sales contract.

In contrast, fire destroyed a mobile home in *Cloud v. Kit Manufacturing Co.*, 563 P.2d 248 (Alaska 1977). Padding stored under the mobile home had been ignited by a heating unit mounted under the structure to keep pipes from freezing. The fire did not result in personal injury and damaged only the mobile home. The Alaska court permitted the plaintiff to proceed with a strict liability action against the home manufacturer.

In a subsequent case, the court explained that loss which resulted from products' failure to live up to their buyers' expectations was covered by the Uniform Commercial Code. In *Morrow*, the product had been delivered in a condition which reduced its actual value below that price actually paid for it. Thus, the defect, if any exist-

ed, did not result in physical harm to the product itself, but merely reduced its intrinsic value. Conversely, the defect in *Cloud* had resulted in a sudden event which physically harmed the product and reduced the product's value in a manner entirely different from that caused by the defective installation or design of the heating unit. Thus, "when a defective product creates a situation potentially dangerous to persons or other property, and loss occurs as a result of that danger, strict liability in tort is an appropriate theory of recovery, even though the danger is confined to the product itself." *Northern Power and Engineering Corp.*, 623 P.2d at 329.

Thus, the unarticulated reasoning behind cases allowing strict liability to be used where a defective product has been damaged in a sudden calamitous event such as fire has been that the damage resulted from actual *physical injury* to the product itself.[4] The sudden event caused the physical harm and added to the product's reduced value. In this regard, damage to the product itself is the physical harm required by Section 402A. The damage present in *Morrow* and other intrinsic value cases is not physical harm, but merely the result of purchasing a flawed product. *See, e.g., Nobility Homes, Inc. v. Shivers*, 557 S.W.2d 77 (Tex.1977).

This delineation between damage resulting from physical injury and that resulting from purchase of unsatisfactory products is in line with the general boundaries of tort and contract theory. Tort law traditionally has been concerned with compensating for physical injury to person or property. Contract law has been concerned with the promises parties place upon themselves by mutual obligation. Physical harm to the defective product belongs with tort principles; reduction in value merely because of the product flaw falls into contract law. *See, e.g., Gherna v. Ford Motor Co.*, 246 Cal.App.2d 639, 55 Cal.Rptr. 94 (1966); *Gibson v. Reliable Chevrolet, Inc.*, 608 S.W.2d 471 (Mo.App.1981); *Russell v.*

*Ford Motor Co.*, 281 Or. 587, 575 P.2d 1383 (1978).

■■■■ Therefore, we reject the line of cases begun by *Santor v. A & M Karagheusian, Inc.*, 44 N.J. 52, 207 A.2d 305 (1964), which have permitted use of strict liability to recover the difference between the value of the product received and its purchase price in the absence of a sudden calamitous event. *See, e.g., Cova v. Harley Davidson Motor Co.*, 26 Mich.App. 602, 182 N.W.2d 800 (1971); *Air Products & Chemicals, Inc. v. Fairbanks Morse, Inc.*, 58 Wis.2d 193, 206 N.W.2d 414 (1973) (applying Pennsylvania law). In West Virginia, property damage to defective products which results from a sudden calamitous event is recoverable under a strict liability cause of action. Damages which result merely because of a "bad bargain" are outside the scope of strict liability.

■■■■ Our decision not to extend strict liability to mere loss in value cases also means that strict liability cannot be used to recover lost profits. Although *Santor* often is cited as a leading case dealing with the recoverability of economic loss, it dealt with direct economic loss, not consequential economic loss such as lost profits. *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965), is the leading case on the recoverability of lost profits. In that case, the plaintiff sought to recover damages for injury to an allegedly defective truck, purchase money paid for the truck, and profits allegedly lost because the truck could not be used. The California Supreme Court rejected the plaintiff's reliance on strict liability to recover lost profits, stating such consequential damages must be recovered on a warranty action. That court's reasoning is based on a proper understanding of the relationship between tort and economic warranty theory and a manufacturer.

[The manufacturer] can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety in terms of conditions

---

**4.** "[S]udden and calamitous damage will almost always result in direct property damage and ... deterioration, internal breakage and deprecia-
tion will be considered economic loss." *Cloud v. Kit Manufacturing Co.*, 563 P.2d 248, 251 (Alaska 1977).

that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands. A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will. *Id.* at 18, 45 Cal.Rptr. at 23, 403 P.2d at 151.

The proper relationship between tort law and the Uniform Commercial Code requires that lost profits be pursued under a warranty or contract theory cause of action rather than strict liability.

## II.

The second certified question arises because the plaintiffs in this case are a commercial retailer and its insurance company. We are asked whether their presence, instead of a private consumer, renders the strict liability doctrine inapplicable. We conclude that the commercial nature of the plaintiffs does not deprive them of a strict liability cause of action.

Star purchased the allegedly defective clock from Pulaski. Star argues that it stands as an ordinary purchaser of the clock despite the fact that it is a retail merchant who bought the product for display and commercial purposes. Star further argues that the presence of Fireman's Fund as a plaintiff does not alter the case since the insurance company's rights derive from any rights possessed by the retailer.

Pulaski makes three principle arguments against use of strict liability in cases involving commercial enterprises. First, the risk distribution principle underlying strict liability is inapplicable because either Star or Pulaski may pass along the costs of insurance or judgments to its customers. Therefore, the advantages of strict liability are not needed by commercial plaintiffs since they will have their costs assumed by the public.

Second, Pulaski argues that the Uniform Commercial Code, contained in Chapter 46 of the W.Va.Code, is a specific body of law which governs economic relationships among commercial enterprises. Third, Pulaski maintains that Fireman's Fund's apparent payment of Star's damage claims further undercuts the risk distribution principle and the need for strict liability.

Star relies on a number of cases in which strict liability has been applied where both plaintiff and defendant were commercial entities. Often, these cases were the vehicles in which strict liability in tort was adopted into the common law of the respective jurisdictions. *See, e.g., Shields v. Morton Chemical Co.*, 95 Idaho 674, 518 P.2d 857 (1974); *Dealers Transport Co. v. Battery Distributing Co.*, 402 S.W.2d 441 (Ky. 1965). Because courts adopted strict liability in such cases, they implicitly approved use of the doctrine in situations involving commercial enterprises. In all fairness, however, it must be noted that the question of allowing a commercial plaintiff to utilize strict liability does not appear to have been raised by the parties or considered by these courts.

Pulaski has cited several cases which specifically hold that commercial plaintiffs are not entitled to rely on a strict liability cause of action. *S.A. Empresa de Viacao Aerea Rio Grandense v. Boeing Co.*, 641 F.2d 746 (9th Cir.1981); *Southwest Forest Industries, Inc. v. Westinghouse Electric Corp.*, 422 F.2d 1013 (9th Cir.1970). Several of these cases have been decided in federal courts bound by the doctrine of *Erie v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). *See, e.g., Empresa, supra.* In these cases, the substantive law of California governed the decision; therefore, the courts purported to follow *Kaiser Steel Corp. v. Westinghouse Electric Corp.*, 55 Cal.App.3d 737, 127 Cal. Rptr. 838 (1976). These courts have incorrectly read *Kaiser* as prohibiting the use of strict liability in cases involving commercial plaintiffs. A correct reading of the decision indicates that *Kaiser* employed a balancing test to decide whether strict liability should be available in such cases. Thus,

there is no support for a flat rule that strict liability is not available for commercial plaintiffs.

Adoption of a consumer/commercial test in strict liability cases would serve no rational purpose. As we have indicated previously, strict liability focuses on the product's safety. In property damage cases, it also focuses on how the defective property itself was damaged. The question is whether a defective product results in physical harm, not when that harm occurred. Thus, it is immaterial whether the defective product causes personal injury or property damage while in a commercial party's possession along the distribution chain or in the possession of an individual consumer or user.

■ Strict liability places an obligation on manufacturers, sellers and distributors to market safe products. These parties should not be able to remove the benefits of strict liability from an injured party merely because the defect caused harm prior to purchase by a private party. For example, if a Star customer had purchased the clock, taken it home and had his property damaged by a fire caused by the clock, it is undeniable that he could maintain a strict liability cause of action. *See generally Morningstar v. Black and Decker Manufacturing Co., supra.* The fact that the harm occurred to an intermediate purchaser makes no difference in application of strict liability.

The risk distribution argument put forth by Pulaski denies the penalty effects of strict liability on a party who places a defective product in commerce. Pulaski's premise is that since either business could pass along insurance costs to the public, liability is meaningless. This argument ignores the fact that businesses should not have to insure against others' mistakes, and that customers of an enterprise such as Star's should not have to bear the cost of such insurance. Pulaski's argument would have the effect of removing all incentive to ensure product safety since the deterrent effect of strict liability would be removed.

■ Thus, we hold that commercial enterprises may utilize strict liability actions to recover damages. As discussed above, recoverable damages do not include lost profits or the difference in value of the defective product and its purchase price absent a sudden destructive event.

Pulaski's argument that the presence of Fireman's Fund alters the availability of strict liability is incorrect. The insurance company is a plaintiff at the request of Pulaski. In this case, the insurance company's right to recover depends entirely upon the right of Star, its insured, to recover. Fireman's Fund has no independent right of action of its own. *State Farm Mutual Automobile Insurance Co. v. DeWees,* 143 W.Va. 75, 101 S.E.2d 273 (1957).

### III.

The third certified question concerns the availability of comparative negligence as an affirmative defense in strict liability cases. Both Star and Pulaski argue that we should apply comparative negligence to such actions. The parties, however, seek to narrow the scope of the comparative negligence defense in this situation by excluding a plaintiff's failure to discover the defect or to guard against it. We agree with this position.

■ Comparative negligence replaced the doctrine of contributory negligence in West Virginia in *Bradley v. Appalachian Power Co.,* 163 W.Va. 332, 256 S.E.2d 879 (1979). In that decision, we noted that comparative negligence moderated the common law's harsh rule of permitting only plaintiffs who are free of fault to recover damages. Comparative negligence, as adopted in *Bradley,* permits plaintiffs to recover damages if their fault does not equal or exceed that of the defendants. *Id.,* 163 W.Va. at 345 n. 19, 256 S.E.2d at 885. In mathematical terms, the plaintiff, in order to recover, cannot be more than 49 percent negligent. *Id.,* 163 W.Va. at 338, 256 S.E.2d at 887 n. 19.

Application of comparative negligence principles, which focus on the parties' conduct, to strict liability in tort presents conceptual hurdles. Strict liability imposes liability on a defendant on the basis of product safety, not on the conduct of the defen-

dant. Thus, a defendant's conduct in the sense of his fault is not an element of the plaintiff's case. However, use of comparative negligence as a defense in products' liability will result in the defendant's liability being predicated upon the product's defectiveness, with the plaintiff's damage recovery being reduced or eliminated by his conduct.

This conceptual problem has led other courts to rationalize or gloss over these difficulties. For example, some jurisdictions have labeled strict liability as negligence *per se*, to which comparative negligence, as in any other cause of action founded on negligence, should apply. *Dippel v. Sciano*, 37 Wis.2d 443, 155 N.W.2d 55 (1967). Other jurisdictions have simply noted the conceptual inconsistencies and pressed ahead in the name of fairness. *Daly v. General Motors Corp.*, 20 Cal.3d 725, 144 Cal.Rptr. 380, 575 P.2d 1162 (1978). Whatever the rationale, a majority of jurisdictions have applied comparative negligence in strict liability actions. Annot., 9 A.L.R. 4th 633 (1981 and 1982 Supp.).

Application of comparative negligence will not remove the advantages which strict liability provides to injured consumers.

> Plaintiffs will continue to be relieved of proving that the manufacturer or distributor was negligent in the production, design, or dissemination of the article in question. Defendant's liability for injuries caused by a defective product remains strict. The principle of protecting the defenseless is likewise preserved, for plaintiff's recovery will be reduced *only* to the extent that his own lack of reasonable care contributed to his injury. The cost of compensating the victim of a defective product, albeit proportionately reduced, remains on defendant manufacturer, and will, through him, be "spread among society."

*Daly*, 20 Cal.3d at 736–37, 144 Cal.Rptr. at 386–87, 575 P.2d at 1168–69. The use of comparative negligence in products liability litigation represents a balancing of competing interests.

> [I]f the rules of comparative liability are applied to cases involving the special duties imposed by law upon product manufacturers, distributors and sellers, there can be an equitable resolution, on the one hand, of the social policy which commands that a manufacturer be deterred from producing defective and dangerous products, and on the other hand, of the equitable policy ... of assessing proportionate liability based upon comparative degrees of causation.

*Kennedy v. City of Sawyer*, 228 Kan. 439, 450, 618 P.2d 788, 797 (1980).

These statements by the California and Kansas courts are consistent with our rationale in *Bradley* in adopting a modified comparative negligence rule. In rejecting the "pure" negligence comparative concept, we declared "that in the field of tort law we are not willing to abandon the concept that where a party substantially contributes to his own damages, he should not be permitted to recover for any part of them." 163 W.Va. at 338, 256 S.E.2d at 885. Since strict liability does not make manufacturers insurers of their products, *Morningstar, supra*, the consumer should not be able to recover for damages which result directly from his conduct.

The problem of focusing on the plaintiff's conduct does not arise only with use of comparative negligence as an affirmative defense. In *Morningstar*, we noted that "[t]he issue of appropriate use of the product has as a counterpart the defense of abnormal use, which may at times carry companion defenses of contributory negligence and assumption of risk on the part of the user." 162 W.Va. at 875, 253 S.E.2d at 683. Thus, we explicitly recognized that the plaintiff's conduct may affect his chances of recovery for injuries caused by a defective product. Comparative negligence does not differ from product misuse or assumption of risk in that all of these defenses focus on the plaintiff's conduct.

As the parties point out, although a majority of jurisdictions have applied comparative negligence to strict liability actions, only a small number have specifically excluded as a part of the defense the failure

88

of the plaintiff to discover or guard against defects. *West v. Caterpillar Tractor Co.,* 336 So.2d 80 (Fla.1976); *Busch v. Busch Construction, Inc.,* 262 N.W.2d 377 (Minn. 1977). *Cf. Suter v. San Angelo Foundry & Machine Co.,* 81 N.J. 150, 406 A.2d 140 (1979) (labels doctrine comparative fault rather than comparative negligence).

 We note, however, that the *Restatement, (Second), Torts* specifically states that a plaintiff's failure to discover a defect or to guard against it should not be considered contributory negligence. *Restatement, (Second), Torts,* § 402A, comment n (1965). This point was discussed in *Morningstar, supra,* by way of dictum. 162 W.Va. at 872, 253 S.E.2d at 682. We adopt this rule because to penalize a consumer for failing to discover defects or to guard against them places a burden on consumers which strict liability was intended to remove. The plaintiff's negligence must be something more than failing to discover a defect or to guard against it. Strict liability assumes that products which are placed in commerce are safe. If not, liability attaches if they result in damage or injury. Thus, there is no reason why a consumer should be expected to inspect products for defects or to guard against them. We therefore hold that comparative negligence is available as an affirmative defense in a cause of action founded on strict liability so long as the complained of conduct is not a failure to discover a defect or to guard against it.

It may be acknowledged that the application of our comparative negligence rule to strict liability in tort cases cuts down some of the traditional concepts of contributory negligence by removing a claim of negligence against the plaintiff for failing to disclose the defect or guard against its possibility. Yet, there remains the area of product abuse and alteration.[5]

In summary, we hold that plaintiffs may use strict liability causes of action to recover for property damage, and that this doctrine is available to commercial entities which suffer harm as a result of defective products. Comparative negligence may be asserted as an affirmative defense which may bar or reduce the plaintiff's recovery in accordance with the principles contained in *Bradley v. Appalachian Power Co., supra.* The certified questions are answered in the affirmative.

Answered and dismissed.

---

5. While assumption of risk is not an issue in this case, we spoke to this defense generally in *Morningstar v. Black & Decker Mfg. Co., supra,* 162 W.Va. at 872, 253 S.E.2d at 683–84:

It does appear that the defense of assumption of risk is available against the plaintiff, where it is shown that with full appreciation of the defective condition he continues to use the product. The hallmark of this defense is actual knowledge on the part of the plaintiff....

To this defense, some courts have added the further requirement that the plaintiff's conduct in proceeding to use the admittedly defective product must be unreasonable....

The difference between these two positions may be more theoretical than real, since in many instances a plaintiff who has full knowledge of the defective condition, and yet proceeds to use the product, will be acting unreasonably. (Citations omitted).