NATIONAL STEEL ERECTION, INC., Plaintiff,

v.

J.A. JONES CONSTRUCTION COMPANY, General Electric Environmental Services, Inc., Defendants.

J.A. JONES CONSTRUCTION COMPANY, Counterclaimant,

v.

NATIONAL STEEL ERECTION, INC., Counter-defendant.

Civ. A. No. 2:94–CV–225.

United States District Court, N.D. West Virginia.

Sept. 20, 1995.

Stephen G. Jory, Jory & Smith, Elkins, WV and George P. Parker, David G. Hazlett, Parker & O'Connell, Louisville, KY, for Plaintiffs and Counter–Defendant National Steel Erection, Inc.

Harry M. Rubenstein, Kay, Casto, Chaney, Love & Wise, Morgantown, WV and Cordell M. Parvin, Warren H. Britt, Curtis G. Manchester, Charles F. Barnett, Jr., Parvin, Wilson & Barnett, P.C., Richmond, VA, for Defendant and Counter–Claimant, J.A. Jones Construction Company.

Charles M. Love, III, Charleston, WV, for Defendant General Electric Environmental Environmental Services, Inc.

## ORDER

KEELEY, District Judge.

### I.

This dispute, arising from a construction project at Virginia Electric and Power Company's ("VEPCO") Mt. Storm plant, requires this Court to decide whether a subcontractor may sue another contractor for economic damages where there is no privity of contract between the parties. The plaintiff, subcontractor National Steel Erection ("NSE"), incurred significant economic loss due to cost overruns and delays allegedly due to the negligent design and project administration of defendant General Electric Environmental Services, Inc. ("GEESI"). In this action, NSE seeks to recover from GEESI and also from defendant J.A. Jones Construction Co. ("Jones"), the construction manager with whom NSE had contracted to perform certain work at the Mt. Storm plant. The parties do not dispute the relevant facts giving rise to this suit.

On May 15, 1991, defendant GEESI and Jones entered into a blanket consortium agreement ("GEESI/Jones Contract") for the purpose of jointly securing the Mt. Storm construction contract. GEESI agreed to serve as the overall project supervisor, with Jones managing the details of the construction work. *See* GEESI/Jones Contract Part 7.3.3. Pursuant to the GEESI/Jones contract, GEESI would contract with VEPCO and Jones would subcontract with third parties.[1]

GEESI and Jones recognized the unique nature of their relationship and, in an effort to minimize the possibility of internal disputes concerning potential liability to third parties, inserted the following indemnification provisions into the GEESI/Jones contract:

> 9.1 *LIABILITY AND INDEMNIFICATION WITH RESPECT TO CLAIMS OF THE CUSTOMER AND THIRD PARTIES*
>
> 9.1.1 It is the express intention of this AGREEMENT that each PARTY's responsibility and liability be limited to its respective SCOPE OF WORK for each PROJECT. Therefore, except as expressly provided otherwise herein, the PARTIES agree to indemnify one another as follows: Each PARTY (Indemnifying PARTY) agrees to indemnify and hold the other PARTY (Indemnified PARTY) harmless from any claim made against the Indemnified PARTY by ... other THIRD PARTIES to the degree that such claim arises in connection with said Indemnifying PARTY's SCOPE OF WORK, for any breach or default of this AGREEMENT or each CONTRACT or is due to the Indemnifying PARTY's fault or negligence.

Part 9.1.2 further states:

> 9.1.2 Except as provided otherwise herein, in the event that claims are

made by ... THIRD PARTIES and the PARTIES fail to agree as to which PARTY is responsible for such fault or negligence on a PROJECT, liability will be provisionally borne by the PARTY designated by the LEADER pending resolution pursuant to the provisions of Part 10.

Subsequent to the execution of the GEESI/Jones contract, VEPCO awarded GEESI the Mt. Storm contract. Thereafter, Jones entered into three subcontracts with NSE: (1) one for the fabrication and erection of carbon steel tanks ("tank contract"); (2) one for the installation of high nickel alloy liners ("lining contract"); and (3) one for the subassembly and erection of necessary duct work ("duct contract").[2] Each of these documents explicitly recognized the managerial structure created in the GEESI/Jones contract.[3] Furthermore, NSE agreed to perform its work in accordance with the general provisions and drawings provided by "the architect, engineer, or other comparable person designated as [VEPCO's] representative" and also promised to accept reasonable design modifications of existing specifications, provided Jones compensated it for these changes. (*See* Articles 8 and 10 as amended by Schedule E.)

NSE contends that, after the execution of these subcontracts, Jones enlarged its scope of work, altered the time of completion and "otherwise interfered with, disrupted and hindered NSE's performance of its contracts, thereby increasing the cost and expense to NSE." NSE also alleges that Jones failed to provide adequate plans and specifications, failed to adjust the contract price to reflect design modifications and failed to timely deliver necessary materials. NSE contends that, as a result of the foregoing actions, Jones breached the express and implied terms of the subcontracts.

1. The Court has been unable to locate these provisions from the portions of the GEESI/Jones contract provided by GEESI. However, counsel for the defendants explained this aspect of their agreement during oral argument.

2. The relevant provisions of each subcontract are identical.

3. The following opening paragraph to each of the Jones/NSE subcontracts states in relevant part:

> Pursuant to J.A. Jones/GEESI Construction Agreement dated May 15, 1991, J.A. Jones ..., 'Contractor,' and National Steel Erection, Inc.... 'Subcontractor,' agree as follows: ....

■ In addition to its claim for breach of contract against Jones, NSE claims, in Counts II, III, and V of the complaint, that certain plans and specifications prepared by GEESI negligently misrepresented the work to be performed by NSE. NSE further claims in Count VI that GEESI fraudulently induced NSE to enter into the lining contract. GEESI contests the validity of NSE's claims and argues that NSE cannot recover economic damages in negligence and, further, has failed to state a claim for fraud.[4] The matter is now before the Court on GEESI's motion for summary judgment.[5]

## II.

■ Summary judgment is appropriate "if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When a moving party supports its motion under Rule 56 with affidavits and other appropriate materials pursuant to the rule, the opposing party "may not rest upon the mere allegations or denials of the adverse party's pleadings, but ... the response ... by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Summary judgment is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue

for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quotation omitted).

## III.

Counts II, III and V of NSE's complaint allege that GEESI is liable for its negligent performance as the "project designer who produced the [c]ontract plans and specifications" for the Mt. Storm site.[6] NSE contends that GEESI had a duty to provide it with correct information and, having assumed this duty, should have known that NSE would rely on its representations; therefore, pursuant to SECTION 552 of the RESTATEMENT SECOND OF TORTS (SECTION 552),[7] GEESI is responsible for its economic damages. In its motion to dismiss, GEESI argues that NSE cannot recover economic losses from a party with whom it had no contractual relationship.

Both NSE and GEESI agree that the West Virginia Supreme Court of Appeals has not specifically addressed the question of whether SECTION 552 would apply to disputes in the construction industry. After carefully reviewing the law in West Virginia, and considering the analysis in cases from other jurisdictions which have considered whether SECTION 552 applies to construction cases,

---

**4.** GEESI does not contest that NSE can recover economic losses for GEESI's fraudulent conduct as a matter of law, but disputes, instead, the adequacy of the allegations contained in the complaint.

**5.** Although GEESI moved to dismiss Counts II, III and V for failure to state a claim, the Court has considered matters outside the pleadings and, thus, pursuant to Rule 12(b) of the Fed. R.Civ.P., converts this motion into one for summary judgment. *Farmer v. Employment Sec. Commn. of North Carolina*, 4 F.3d 1274, 1279 n. 8 (4th Cir.1993).

**6.** Count II focuses on GEESI's alleged changes in the Jones–NSE lining contract which caused NSE economic damage. NSE seeks to hold GEESI liable in Count III for failing to process change orders in a timely fashion. Finally, in Count V, NSE contends that GEESI's design deficiencies vis a vis the NSE–Jones duct contract caused NSE significant economic damage.

**7.** SECTION 552 provides in relevant part:

§ 552. Information Negligently Supplied for the Guidance of Others

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

this Court concludes that West Virginia would not permit NSE to recover economic losses from GEESI.

## A.

Even as it has expanded tort remedies in other contexts, the West Virginia Supreme Court of Appeals has continued to recognize a distinction between tort and contract causes of action where the damages claimed are economic in nature. *See Basham v. General Shale,* 180 W.Va. 526, 530, 377 S.E.2d 830, 834 (1988); and *Star Furniture Co. v. Pulaski Furniture Co.,* 171 W.Va. 79, 84–85, 297 S.E.2d 854, 859 (1982). In *Basham,* the court reaffirmed its long standing commitment to the application of the "economic loss" rule in commercial transactions and precluded the plaintiffs in that case from using tort remedies to save their claim for economic damages to their home and place of business from the statute of limitations period applied by the Uniform Commercial Code.[8] The court held that damages "which result merely because of a 'bad bargain' " fall outside the realm of tort law. *Id.* at 530, 377 S.E.2d at 834 (quoting *Star Furniture,* 171 W.Va. at 84–85, 297 S.E.2d at 859). Less than a year after *Basham,* however, the court permitted a third party to recover from an accountant for economic loss under Section 552 of the Restatement Second of Torts. In *First National Bank of Bluefield v. Crawford,* 182 W.Va. 107, 386 S.E.2d 310 (1989), the plaintiff bank sought to recover its economic losses from an accountant who had negligently prepared financial information on which the bank had relied to its detriment in providing a loan. *Id.* at 107–08, 386 S.E.2d at 310–11. The court concluded that, on the facts presented, it would not be commercially unreasonable to impose a duty of care on an accountant or any other professional who issues reports with the knowledge that third parties will rely on them.[9] *Id.* at 110, 386 S.E.2d at 313. The decision in *First*

*National Bank of Bluefield* neither distinguished nor overruled *Basham,* leaving open the question whether that case had merely created a narrow exception to the "economic loss" doctrine in cases of accounting negligence or, instead, had engrafted Section 552 in its entirety into West Virginia's damages jurisprudence.

In *Silk v. Flat Top Const. Inc.,* 192 W.Va. 522, 453 S.E.2d 356 (1994), the court appears to have answered that question by applying the economic loss rule in the context of a construction project where the plaintiffs were complaining about cost overruns and delay. The Silks, acting as a contractor for their own home, initially had sued their supervisory consultant, Craft Builders, for economic loss caused by its alleged fraud, breach of contract and negligence. *Id.* at 523–24, 453 S.E.2d at 357–58. After Craft Builders learned that their insurance company had refused to defend the suit, it filed a third-party complaint seeking a declaration of coverage under its policy.

In addressing the coverage question, the West Virginia Supreme Court of Appeals concluded that the policy only required the insurance company to defend against a cause of action for negligence. *Id.* at 526, 453 S.E.2d at 360. Without referencing either *Basham* or *First National Bank of Bluefield,* the court rejected the plaintiffs' negligence claim after concluding that the basis for the Silks' claim against Craft Builders originated "solely in contract." *Id.* at 526, 453 S.E.2d at 360. Significantly, the court *never* indicated that the Silks might have been able to pursue their claim for cost overruns and delays under Section 552.

## B.

NSE argues that numerous jurisdictions have permitted recovery of economic damages in tort in construction cases such as the one at bar,[10] and that the decision in *First*

---

8. The plaintiffs were seeking recovery in strict liability for harm to their home and place of business caused when defective bricks purchased from the defendant manufacturer disintegrated. *Basham,* 180 W.Va. at 527, 377 S.E.2d at 831.

9. The court noted that it was addressing only "the narrow issue of whether lack of privity of

contract is an absolute defense in a suit for accounting malpractice." *First National Bank of Bluefield,* 182 W.Va. at 108, 386 S.E.2d at 311.

10. *See e.g. Jim's Excavating Service, Inc. v. HKM Assoc.,* 265 Mont. 494, 878 P.2d 248 (1994); *Mid–Western Elec., Inc. v. DeWild Grant Reckert & Assocs. Co.,* 500 N.W.2d 250 (S.D.1993);

*National Bank of Bluefield* indicates that West Virginia would follow suit. In the seminal case of *United States v. Rogers & Rogers*, 161 F.Supp. 132 (S.D.Cal.1958), a general contractor of a federal school construction project sued the architect hired by the United States for economic harm caused when the architect, who initially represented to the contractor that its concrete conformed with government specifications, stopped the project upon realizing that the concrete was inadequate. *Id.* at 135. Relying on the fact that "[t]he power of the architect to stop the work ... is tantamount to a power of economic life or death over the contractor," the court concluded "that such authority, exercised in such a relationship, [must] carry commensurate legal responsibility." *Id.* at 136. Accordingly, it permitted the contractor to sue the architect for negligent misrepresentation even though these parties had not contracted with each other. *Id.*

GEESI contends that, although many jurisdictions embraced the holding in *Rogers & Rogers* after it was decided nearly 40 years ago, that trend was halted when scholarly articles appeared severely criticizing the position adopted there as undermining economic certainty and predictability. *See* Matthew S. Steffey, *Negligence, Contract, and Architects' Liability for Economic Loss*, 82 Ky. L.J. 659 (1994); *see also* Wright and Nicholas, *The Collision of Tort and Contract in the Construction Industry*, 21 U.Rich.L.Rev. 457 (1987). In support of its argument, GEESI points both to jurisdictions that initially had imposed wholesale liability on design professionals but have now retreated from that position, and also to jurisdictions that have addressed the issue for the first time and have rejected SECTION 552 in construction cases.

The Supreme Court of Florida, which initially embraced the rule of *Rogers & Rogers* in *A.R. Moyer, Inc. v. Graham*, 285 So.2d 397, 400–2 (Fla.1973), has since confined that decision to its facts. *See Casa Clara Condo. Assn., Inc. v. Charley Toppino & Sons*, 620 So.2d 1244, 1248 n. 3 (Fla.1993) ("We also limit *A.R. Moyer, Inc. v. Graham*, 285 So.2d 397 (Fla.1973), strictly to its facts."). The Florida Court of Appeals for the Third District has *per se* precluded subcontractors from bringing negligent misrepresentation actions in construction cases. *See Spancrete, Inc. v. Frazier & Associates, P.A.*, 630 So.2d 1197–98 (Fla.3rd Dist.Ct.App.1994).

The Supreme Court of Washington, in an *en banc* decision, recently decided that SECTION 552 unwisely blurs the distinction between tort and contract law in the context of a construction case. In *Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1*, 124 Wash.2d 816, 881 P.2d 986 (1994), the court prohibited a general contractor from recovering economic damages allegedly caused by the negligent misrepresentations of the architect and a structural engineer. *Id.*, 881 P.2d at 988–89. Despite the fact that Washington had previously adopted SECTION 552 in other contexts, in *Berschauer* the court concluded that "when the parties have contracted to protect against potential economic liability, ... [as] in the construction industry, contract principles override the tort principles in § 552." *Id.* at 993. The court reached this result on the ground that "if tort and contract remedies were allowed to overlap [in this context], certainty and predictability in allocating risk would decrease and impede future business activity." *Id.* at 992.

Relying on policy grounds, Virginia, too, has rejected any claim for negligent misrepresentation in the construction industry. In *Blake Constr. Co., Inc. v. Alley*, 233 Va. 31, 353 S.E.2d 724 (1987), the Supreme Court of Virginia refused to permit a general contrac-

*Guardian Const. Co. v. Tetra Tech Richardson, Inc.,* 583 A.2d 1378 (Del.Super.Ct.1990); *Forte Bros., Inc. v. National Amusements, Inc.,* 525 A.2d 1301 (R.I.1987); *M.J. Womack, Inc. v. State House of Rep.,* 509 So.2d 62 (La.App. 1st Cir. 1987); *Waldor Pump & Equip. Co. v. Orr–Schelen–Mayeron & Assoc., Inc.,* 386 N.W.2d 375 (Minn.App.1986); *Bacco Const. Co. v. American Colloid Co.,* 148 Mich.App. 397, 384 N.W.2d 427

(App.1986); *Donnelly Constr. Co. v. Oberg,* 139 Ariz. 184, 677 P.2d 1292 (1984); *Mayor & City Council v. Clark–Dietz,* 550 F.Supp. 610 (N.D.Miss.1982); *Conforti & Eisele, Inc., v. John C. Morris Assocs.,* 175 N.J.Super. 341, 418 A.2d 1290 (Law Div.1980); *Shoffner Indus., Inc. v. W.B. Lloyd Const. Co.,* 42 N.C.App. 259, 257 S.E.2d 50 (1979).

tor to sue the engineers and architects hired by the owner. In doing so, the court stated:

> The parties involved in a construction project resort to contracts and contract law to protect their economic expectations. Their respective rights and duties are defined by the various contracts they enter. Protection against economic losses caused by another's failure to properly perform is but one provision the contractor may require in striking his bargain. Any duty on the architect is purely a creature of contract. *Id.*, 353 S.E.2d at 727.

Referencing *Blake*, the Supreme Court of Ohio has reached a similar conclusion. In *Floor Craft Floor Covering, Inc. v. Parma Community General Hospital Association,* 54 Ohio St.3d 1, 560 N.E.2d 206, 208 (1990) the court held that "tort liability [can] not be imposed for purely economic damages".[11]

### C.

■ In the instant case, the damages for NSE's cost overruns and delays "have their sole origin in contract." *Silk*, 192 W.Va. at 526, 453 S.E.2d at 360. When NSE contracted with Jones, it was fully aware of the unique structure of the GEESI/Jones "consortium". Had it wanted protection against the kind of economic losses it claims to have suffered because of GEESI's alleged failure to properly perform its duties, NSE should have negotiated such a provision when it struck its bargain with Jones.

Under the facts of this case, to allow NSE to sue GEESI for negligent misrepresentation would permit it to recover benefits it was unable to obtain in contract negotiations. NSE is a sophisticated contractor that was well aware of the economic risks associated with its business when it negotiated with Jones. Consequently, this Court believes that West Virginia would agree with the conclusion of the Washington court that "contract principles override the tort principles in SECTION 552" in construction cases, *Ber-*

*schauer/Phillips,* 881 P.2d at 993, and would enforce the allocation of risk voluntarily created by the parties. This result is consistent with the current state of the law in West Virginia which, despite the adoption of SECTION 552 in other contexts, continues to recognize the economic loss rule in commercial transactions and to enforce economic protections bargained for by the parties. *See Silk,* 192 W.Va. at 526, 453 S.E.2d at 360.

### III.

■ In Count VI of the complaint, NSE alleges that GEESI fraudulently negotiated with it for the performance of a lining contract. NSE contends that, after it demonstrated its work to GEESI, GEESI issued a letter of intent (effectively approving NSE's proposed method of lining) even though it knew the method did not conform with VEPCO specification of the so-called "spark method" test. GEESI then assigned this letter to Jones who later informed NSE that it had to perform the lining work in a manner other than originally demonstrated to GEESI. NSE claims that as a result of these actions it incurred additional costs and suffered significant economic loss.

With its motion for summary judgment, GEESI submitted an affidavit from Russell Lewis, GEESI's vice president of purchasing and estimating. In his affidavit, Lewis states that NSE was not forced to comply with the "spark test method" and was aware of all requirements that it would have to follow prior to receiving GEESI's letter of intent. Lewis further contends that GEESI did not assign this letter to Jones but canceled it entirely. Finally, Lewis swears that NSE's demonstration procedures fully complied with VEPCO specifications. Accordingly, GEESI contends that there are no facts to support the fraud claim set forth in Count VI of the complaint.

---

11. In *Clevecon v. Northeast Ohio Regional Sewer Dist.,* 90 Ohio App.3d 215, 628 N.E.2d 143 (1993), the Ohio Court of Appeals for the Eighth District interpreted *Floor Craft* to permit a general contractor to sue the project owner's lead architect where its corresponding supervisory duties were adequate to establish the requisite nexus under SECTION 552. *Id.*, 628 N.E.2d at 146–47. Nowhere in the *Clevecon* decision, however, does the appellate court address the policy concerns expressed in the *Floor Craft* decision other than to note the need to protect design

In its response to GEESI's motion for summary judgment, NSE raised new facts about its fraud claim not alleged in the complaint.[12] NSE now claims that GEESI knew its pre-bid sample work did not conform to additional VEPCO procedures and, as a result of GEESI's failure to inform NSE of these requirements, it incurred significant additional costs. NSE further contends that GEESI knew at the time of its initial negotiations with NSE that it would later assign its right to secure the lining contract to Jones.

The parties disagree about whether GEESI informed NSE of VEPCO specifications prior to executing its letter of intent, and further, whether GEESI intended to assign this letter to Jones at the time it negotiated with NSE. Consequently, material disputes of fact exist which preclude summary judgment on this issue.

█ Notwithstanding these disputes, GEESI urges the Court to dismiss Count VI on the ground that it fails to meet the heightened pleading requirements of Rule 9(b) of the Fed.R.Civ.P. and, in fact, entirely omits the allegations now relied on by NSE. This Court agrees that NSE has not adequately pleaded its claim but, in accordance with Rule 15(a) of Fed.R.Civ.P., will grant NSE leave to amend its complaint in this respect. *Mylan Laboratories Inc., v. Matkari*, 7 F.3d 1130, 1137, 1139 (4th Cir.) *cert. denied,* —— U.S. ——, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1993) (suggesting the district court permit the plaintiff to file a fourth amended complaint to include new factual allegations in support of its claim for mail and wire fraud in the event it finds the third amended complaint inadequate).

### CONCLUSION

For the reasons stated above, the Court GRANTS GEESI's motion for summary judgment on Counts II, III and V, DENIES GEESI's motion for summary judgment on Count VI and ORDERS NSE to amend Count VI of the complaint no later than thirty (30) days after the entry of this Order.

professionals "from unforeseeable damage claims." *Id.*

12. In support of these new allegations, NSE provided sworn affidavits from Michael Roxy, an

The Clerk is directed to transmit copies of this Order to counsel of record herein.

employee of NSE, and Chuck Thompson, whose relationship to NSE is not clear.